Number 06-1222, Propat International Corporation v. Rpost, U.S. Attorney General, Mr. Jones. May it please the Court. In the agreement, Authentics conveyed to Propat all substantial rights in the 219 patent that would enable Propat to fully exploit the patent not only in the marketplace but also in the courtroom if necessary. The initial inquiry is to what is the intention of the parties in the agreement? And in looking at the intention of the parties, we look to the entire agreement and to try to harmonize anything that may come out and look inconsistent. In looking at the agreement between Authentics and Propat, we find that direction in the whereas clause specifically states the desires of the parties in that the client, meaning Authentics, desires to grant Propat the exclusive right to enforce, to license other parties to use, to manufacture, and to sell such products and or processes in certain territories under the aforesaid technology and related know-how, and Propat desires to accept these. The judge, the district court, found that in the grant that was provided in the agreement, it did not convey the exclusive right to sue, that the language enforced was not referring to suing on infringement but was referring to suing or enforcing license agreements. And that another provision in the agreement, namely paragraph 2.2, which specifically states that the client hereby grants and authorizes Propat to sue any entity Propat deems an infringer, was the grant in the agreement of the right to sue and it was not exclusive. So that was the controlling question that the court found in finding that the agreement was not an exclusive license and that it did not convey all substantial rights and that it was merely a bare license that did not provide the plaintiff with any standing to be in the case. So looking at the rights of conferred, we know that it was the grant in the language of the patent, paragraph 2.1, is the overall grant of rights. And in that paragraph it specifically states that the client, meaning Authentics, grants to confer a right to enforce, to establish through license or other suitable arrangements with third parties the manufacture, lease, sale, and or use of the licensed technology and licensed know-how. So from that paragraph you have three rights that are conveyed. One, the sole and exclusive right to enforce, the sole and exclusive right to license, and the sole and exclusive right to enter into other suitable arrangements. Paragraph, the second sentence in that paragraph reinforces that construction of the term enforce because it says that PROPAT shall use reasonable efforts consistent with prudent business practices to enforce the licensed technology. And the licensed technology here is referring to the 219 patent. It is not, that sentence is not referring to enforcing other license agreements. It's referring to enforcing the patent. And that language, enforce, is used in other places in the agreement, which specifically talks about bringing a claim for patent infringement in litigation. This- I'll tell you what I don't understand. Once this question was raised, once the challenge to the licensee's standing was raised, why not just join the patentee? I mean, why have we, why has this turned into a federal case on who has, on whether or not your client had standing of itself? The plaintiff did request the court permission to join the patentee. However, the court found that the agreement merely was a bare license, and that the plaintiff could not cure standing by joining the patentee. Did the patentee refuse to be joined? No, Your Honor, the patentee did not refuse, and specifically under the agreement, the patentee had an obligation to be joined if it was required or if it was found that it was a necessary party. The court found that it could not join the patentee or actually authentics, which was the assignee, the original assignee from the inventor, could not cure the original standing. It found that it did not have even constitutional standing, much less the prudential standing. And we are on appeal today arguing that, one, we did have prudential standing, which would enable PROPAD to sue in its own name, and in the alternative, we had constitutional standing, Article III constitutional standing. Suppose that the day after you got the trial court's order in this case, and even though you disagreed with it, and I understand obviously you do, you had simply gone to authentics and said, okay, we're now going to bring a follow-on action with you as the sole plaintiff. The district court apparently doesn't want to have us in the case. How would your situation differ from the situation that you would like to have if you get a remand from this court? The situation would differ in that at the time the court dealt with the issue of standing, the plaintiff, PROPAD, had already obtained a summary judgment of infringement and a summary judgment that the patent is not invalid. So we had reached considerable stage in the case and actually had been scheduled for trial on damages and a couple of other issues. And absent some of the hurricane that hit the Texas coast, we would have actually had the trial. But you don't suppose that, since this case would almost certainly be assigned to the same judge, that the judge would have come out differently to you with respect to those two issues if a different plaintiff were substituted, where the substitution was done simply to cure a, in effect, a pleading defect? I do not believe that the court would come out differently on the infringement contentions. The other part of it is the invalidity. I believe that the patent is valid and is presumed valid, but part of the reason that we were able to obtain the summary judgment that the patent is not invalid is that the defendant did not bring forth any evidence at that time. We made a motion for summary judgment that the patent was not invalid, and the defendant at that time had the burden of bringing forth proof, and it did not do that. Had the defendant challenged your standing at that stage? The defendant did not challenge our standing at that stage. In fact, it was basically the plaintiff, the defendant raised it in several hearings saying, we don't believe that they're standing here, but never moved to dismiss. It was after the court was forced to move the trial by a few months because of the hurricane, the plaintiff then decided and asked leave of the court to deal with this issue before trial rather than going through the whole trial and having it brought up at that time, deal with it now while we had some time. And so at that time, the court allowed it, and also at that time, the defendant made a separate motion, so there were two motions on the issue of standing before the court, and that's when the defendant first raised the issue with the court on standing. So to answer your question is, we would like to have that ruling in this particular case remain, and I believe we can have it remain if the court remands, and if the court finds that it did not have prudential standing, but at least had Article III constitutional standing, it could remand it to the district court, and then the district court could then join the assignor to the case and cure prudential standing, and then have the case move forward from there, or make a decision as to whether or not it wants the case to move forward from where it left off. So the language, the controlling language is the word in force, and... Let me ask you another question. As I read this agreement, this sounds, if you strip away some of the potentially extraneous material in the agreement, it sounds like what it comes down to is that the owner of the patent wants somebody else to handle the headaches of licensing and enforcement, but wants to maintain a substantial chunk of the benefits of beneficial ownership of the patent, and is willing to give up some chunk of the benefits of licensing and enforcement. But basically, PROPAD is in the position, it seems to me, as I read through this entire agreement, of just a patent manager, looking for licensees and looking for potential defendants of their infringers. That doesn't sound like a transfer of all substantial rights to the patent. Why is it? Well, if you look at the rights, and just taking away the extraneous materials you said, what the authentics retained, primarily, was a right to have some involvement. It did have a right to be informed, and to... And to veto. Yeah, and to veto. Right. So you have to give us prior information about whether you intend either to sue or to transfer, and we have the right to say no. Correct. But primarily what it really wanted, and what it really obtained, was compensation, because it had the right to share in any of the proceeds, judgments, licensing, proceeds. That's what it primarily got. And compensation is something that normally goes along with an assignment. And this Court, on several occasions, found that compensation provisions in the Volckl case, I think in the other cases, the intellectual property development case, compensation is not something that detracts from the transfer of all substantial rights. Compensation is necessarily part of any agreement, even an assignment, that some method of compensating the inventor or the patent owner for that agreement is built into the agreement. But I didn't see... Go ahead. Well, I really, this is sort of pursuing the same point. I didn't see your argument as saying that in the absence of that contractual provision for enforcement, you necessarily had, based on precedent in law, the right to sue in your own name, but that it was the contractual provision that established the right to sue. And if you have the exclusive right to sue, then the patentee or the assignee, whoever it is, doesn't have that right. Therefore, the defendant is protected. Is that your argument? That is our argument. That is the primary argument that the bulk or the substantial rights that a patent gives, meaning to exclude others from making and using it, was transferred to PROPAT, to the plaintiff in this case. And plaintiff, PROPAT, exercised that right by filing an infringement action. And the policy behind the prudential standing is such that the defendant should not be afraid of having to deal with this lawsuit and then another lawsuit later on by the patent owner or their sign or. And in this case, that's why we did not retain any right to sue, so that it cannot bring another lawsuit against our post. And therefore, the rights that are adjudicated in this case will be final as to our post and their infringement. Okay. Now, suppose, I'm still struggling with this notion of the management firm for the patent. Suppose you have a client who has a patent and that client trusts you and comes to you and says, Mr. Johnson, I think you're a terrific lawyer and you really know the patent business. I want you to make the decisions with respect to whether to sue and whether to license. And I'm going to put my decision in writing and I'm going to say, you are exclusively responsible for deciding when to sue people on my patent. And in fact, I'm going to give you a piece of the action if you get a license or if you get a resolution through litigation. But of course, I want you to keep me informed as to what you're doing and I want to have the ultimate right to say no if I don't like what you're doing. Do you become the owner of that patent or the transferee of that patent, the assassinee of the patent? It doesn't seem like it to me. Well, I guess it's determined by what rights are retained. You've given over, I think, the primary right that a patent has, meaning the right to sue. And it's the exclusive right. I'm assuming that it's the exclusive right to enforce the patent. I've told you I won't make the decision to sue without consulting you and you are the only lawyer I'm using. I don't believe in that particular aspect that cases would allow that person to bring a case in their own name, that you would have to join. How does that differ from this case, though? It's different from this case in that they have the right not only to sue people, to enforce the patent, they also have the right to license, they also have the right to indulge infringement. And the cases have found that... I just gave those rights to you as my lawyer because I want you to make those kinds of decisions, because I trust you. So you've given over those substantial rights. I've allowed you to decide who to sue, whether to sue, subject to consulting with me, and whether to license. I don't believe in that case, from what you just said, you've given me the decision, but you haven't transferred the rights to me. Is that the distinction? Well, I'm not sure what the difference is. Well, I believe if you haven't transferred the rights to the patent such that in the And I have the rights. The rights to the patent is an ultimate fact, sort of determined after you've determined what rights have been distributed between the parties. I have given you the right to make the decision as to whom to sue or whether to sue, but I still get the lion's share, the bulk of the proceeds of the suit if one is brought. You don't own the patent, right? I don't believe in that case you would own the patent, but I don't believe that that's the case here. And I don't know if I, because he didn't transfer the right to make the decision, although the decision is squarely within the confines of PROPAT, and that's what the paragraph 2.2 specifically says, that PROPAT is authorized to make the decision, and it's authorized to make that decision and to manage the litigation. The other courts have found that where you have, and I think my time is out completely. It is. You finished the sentence. I guess what I'm trying to say is where you have completely the decision and the rights to enforce the patent, to license the patent, and to enter into these other agreements, then you have transferred all substantial rights. Okay. Thank you, Mr. Johnson. Okay. Mr. Benzi? Good afternoon, Your Honors. Thank you. May it please the Court. I think Judge Bryson hit the nail right on the head. PROPAT is a licensing agent and nothing more. PROPAT does not have an ownership interest. This agreement clearly is not an assignment. The parties knew how to make an assignment. They don't say it's an assignment. They're relying on the clause which says you have the exclusive right to enforce. Correct, but when you look at the— When my question is, why do you—and I don't know the answer to this question. I don't think it's come up before, but if you give someone the exclusive right to enforce the patent and retain no right to enforce the patent, why does it matter whether, if you didn't have such a clause—all of our cases have evolved because there wasn't such a clause, and the question was, do you or don't you have all substantial rights as a matter of law, and we've got all kinds of nuances in that interpretation. But here, we have an explicit grant of the exclusive right to sue. Now, where does that stand? You do not have an exclusive—you do not have a grant of the exclusive right to sue. In paragraph 2.2, you have the grant of the right to sue, and there's no language of Dealing with this article, meaning paragraphs 2.1 and 2.2, you have to get authentics' consent. So, the transfer of the right to sue was not an exclusive right. What's this? So, an exclusive, non-transferable right to enforce. Correct. You're saying that's not exclusive even though it says exclusive? I'm saying paragraph 2.2, which specifically talks about lawsuits. Paragraph 2.1 talks about licensing, and yes, it does use the language enforce. What does enforce mean? Well, enforce in this context can only mean enforce license agreements, because if you look at paragraph 2.2, that talks about the right to sue. Now, if the intent had been to transfer the right to sue exclusively, paragraph 2.2 would have said that. When you look at all substantial rights, that means all. You look at, does Authentics have any rights, any of the substantial rights? If it has any of the substantial rights, then PROPET cannot be the sole plaintiff. And you look at the rights that Authentics has. Authentics has the absolute veto of an assignment of this agreement. Absolute veto. That's a substantial right. But the cases hold that that does not defeat the transfer for, let's say, capital gains purposes. That is essentially substantially transferring the property. That's retaining a security interest. I don't think so. I think if you look at SICOM, it says that the assignment, and if you look at Abbott Labs, when the assignment may be exercised arbitrarily, where the veto on the assignment can be exercised arbitrarily, as this agreement specifically says, that is an absolute veto. It's not a veto of an assignment where that veto has to be exercised reasonably. SICOM says, and Abbott Labs say, that the ability to prevent an assignment, the absolute ability to prevent an assignment, means that PROPET is not the owner. Authentics has to maintain the patent, that it's explicit in the agreement. That is a substantial right, and this Court's Mentor case says that that is a substantial right. Authentics is entitled to an assignment from any PROPET licensee of any improvements that licensee makes. That means that Authentics continues to own the patent. And that's what the all-substantial rights test is. It's a shorthand way of saying... It doesn't defeat the exclusivity? I'm sorry? You're saying because of this grant-back obligation, it defeats the exclusive right. I think there are cases... I don't think it's so clear-cut. I think when you look at the whole bundle of rights, Authentics may continue to practice the invention. In fact, it's expected to, because it's it. It's expected to, in the future, develop improvements to the patent. Authentics is... Contemplate that Authentics can continue to practice the invention. Paragraph 1.1 of the agreement. What is licensed includes any apparatus, process apparatus or component in the future developed by Authentics. I'm putting ellipses in that sentence. That means Authentics is contemplated to practice the invention. What we have here is a licensing agent. Nothing more. And one of your Honor's questions to Mr. Johnson was, why didn't we raise this earlier in the case? The answer to the complaint asserted lack of standing. This was raised from the beginning. We didn't make the motion until late in the case. But it was clear from the beginning. It should have been clear to PROPAT from the beginning that they needed to get this resolved. They could have brought Authentics in long, long before this ever happened. And the court could have decided at that point, is this an exclusive licensee? Is a PROPAT exclusive licensee? Or is it a bare licensee? The reason why it's a bare licensee, if Authentics had sued ARPOST for patent infringement, would PROPAT have been a necessary party to that lawsuit? The answer is no. Authentics could have sued all by itself. This agreement does not prevent Authentics from suing for patent infringement. And the reason why is there's nothing that says Authentics may not sue for patent infringement. And under PROPAT's view, PROPAT can have the exclusive decision whether or not to sue for infringement. And if they decide there's infringement, but we don't want to sue for whatever reason, Authentics couldn't do anything about it. Now, something you just said raised a question which I don't know the answer to, but perhaps you do. I hope so, since you're assuming that it's the case. But it's certainly the case that the exclusive licensee is deemed to have standing to sue, but has to join the owner of the patent in a pure exclusive licensee owner type situation. But I was not aware of any law to the effect that the owner of the patent in order to sue must join the exclusive licensee. If I own the patent and I've granted an exclusive license to you, but you really don't ever exercise it, and you don't care, but I care about the patent, why do I have to join you? First of all, is there any case law that says I do? I think this Court's Aspects Decision 434 F. 3rd 1136 certainly suggests that, because they're remanded, I think, for that very question. Well, logically, why? I mean, sure, you've bought for a pittance an exclusive license to a patent neither of us cares much about, but suddenly I get interested in it, you don't, but I decide to sue an infringer. Do I really have to join you just because I've given you a license and promised not to license anybody else? Yes, for the very reason that the alleged infringer is at risk from someone else coming in and suing him. But that other person is not at risk from the exclusive licensee suing alone, because that exclusive licensee has to join me, and, of course, I'm already res judicata with respect to any disposition between you and me. So they're not at risk from the licensee. Well, I think for the very reason that the patentee is a necessary party to an exclusive licensee's lawsuit, the same logic should apply the other way. They both have to be in that lawsuit because they both have rights in the patent and both have an interest in the result in the litigation. But in an authentic broad lawsuit against our post, ProPatent would have no interest in that litigation, and that's another way of looking at why it's a bare licensee. A point you were just about to get to, let me ask you one question on that. Why is it that, assuming you're right that ProPatent does not have all substantial rights in this patent, why is it that the various rights, and in particular the rights to essentially share the proceeds of the patent, are not sufficient to give it Article III standing, an interest, in fact, in the outcome of the litigation, such that it should be allowed to join, given an opportunity to join Authentics and proceed with the lawsuit? There are a number of reasons. First of all, it never made a motion to do that. It asked in the context of this motion, the underlying motion that raised the standing, if the court doesn't agree, will you allow us to bring in Authentics? But that's not really a motion. I mean, it didn't raise it. It's a request as opposed to a motion? Well, the reason why it's not a motion, we would have opposed that motion if it had been brought because ProPatent knew from day one, because of our answer, that this was an issue. We litigated for two-plus years. There's a fairness issue as well that needs to come into play. When a party asks to add another party to an existing lawsuit, at what point in the lawsuit does that come into play? Here, there was, in our view, no question that ProPat could not have reasonably believed it had the exclusive right to be the sole plaintiff in this lawsuit. This all goes to whether or not such a motion, if made, ought to be granted, but why don't they have Article III standing under the test of injury in fact? Because they don't have enough rights in the patent. They're not an owner of the patent. The owner of the patent is Authentics. And all they have is a right to some portion of the proceeds of either licensing or of litigation if Authentics approves that. In essence, Authentics has to approve contacting licensing before ProPat can do it. ProPat can identify potential targets of licensing. Authentics has to say, okay. Is that in the contract? It is, Your Honor. If you give me just a second, I will cite you the paragraph. 2.3. That's right, Your Honor. No, it's even more. Yes, you're right. 2.3. And 6.1 has the procedures. 2.3, they have to get approval. If ProPat identifies a potential licensee, they have to get Authentics' approval to contact them. That's for the licensee. We're talking about suing and freezing. Same with suing because 2.3. Is that in the contract about suing? 2.3. That was my question. 2.3 says ProPat agrees to consult with and obtain prior approval, which shall not be unreasonably withheld or delayed from client regarding selection of targets for licensing or any other matter covered by this Article 2. Article 2 is the article that talks about the grant of rights, which includes the right to enforce. If it can't be unreasonably withheld, then why is that a withholding of a substantial right? Well, when you put it all together, they need to get approval before they can contact a potential licensee. They need to get Authentics' approval before they enter into a license. They have to provide Authentics copies of all material drafts of potential license agreements. They have to get Authentics' approval before they can sue someone. Granted, all those approvals cannot be unreasonably withheld, but every step of the way, ProPat has to say, Mother, may I? May I do this? May I do that? Now, on the assignment of this agreement... But they can't say no? I'm sorry. They can't unreasonably withhold that? They cannot unreasonably say no. With respect to assigning this agreement, Authentics can. This agreement may not. This is a paragraph 15.7. But that doesn't help. That's just a security interest. But the rest of it, there is a point. This is really to be probed as to just what the arrangement was between these parties. They're given the exclusive right to license. They're given the right to sue. And they need to consult with a patentee who certainly has a security interest since they get a piece of the royalties. And we know that that doesn't defeat exclusivity. That's true, but Authentics has to maintain the patent. Authentics continues to own the patent. Authentics can practice the invention. ProPat itself cannot practice the invention. There is not the transfer of the right to make or use embodiments of the invention. ProPat cannot practice this invention. What was given, what this agreement is, and I see my time is up, it's a licensing agent arrangement. It's far from the all substantial rights that it needs to be in order to allow ProPat to be the sole plaintiff. Okay. All right. Thank you, Mr. Bainsfield. Thank you, Your Honor. Mr. Johnson, a couple of minutes for rebuttal. Thank you. First point I would like to address is the juxtaposition of paragraph 2.1 and 2.2 in that they're not mutually exclusive. Paragraph 2.2, which is directed, paragraph 2.1 specifically conveys the sole and exclusive right to enforce the patent. Are you sure? To enforce or to enforce against licensees? I mean, that's really the question, isn't it? It is. And the second language, the second sentence in paragraph 2.1 specifically talks about enforcing the license technology, and then the last part of that sentence, which is separate from that first part, is talking about licensing. Also, the word enforce later on in the agreement also talks about enforcing it in the context of litigation. What paragraph 2.2 was doing was specifically putting the decision-making, meaning in enforcing the patent by bringing a lawsuit, the decision is solely within the context of propat, meaning anyone that they deem necessary or that they deem to be an infringer, they can bring the lawsuit against. That's what the object of 2.2 was. It is not to convey the right to sue. That had already been conveyed in 2.1. It is a necessary, it is basically qualifying that right by saying we authentics give over any decision-making, which is what Judge Bryson was talking about, any decision-making over to you. Secondly, with regards to prudential standing, I would ask the Court to look at the intellectual property development case and the orthopharmaceutical cases, and those two cases specifically talk about the beneficial rights. You don't have a bare license where you can rely on not being sued. You actually have some right in other people's infringement by getting money, some beneficial right in that. Regarding the assignment back of improvements, the Speed Plate case specifically talked about that in saying it's keeping a reversionary interest in anything that comes back, and all of these rights flow through the path of the agreement so that when they are assigned back, they flow through the path that was made by the agreement and they flow back to PROCAT. Thank you. Thank you, Mr. Johnson. Mr. Benzie. Case is taken under submission.